UNITED STATES of America,

v.

Paul M. DAUGERDAS,
et al., Defendants.

No. S3 09 Cr. 581 (WHP).

United States District Court,
S.D. New York.

Nov. 23, 2010.

Nanette Louise Davis, Stanley John Okula, Jr., Jason Peter Hernandez, U.S. Attorney's Office, New York, NY, for Plaintiff.

Brian Jason Fischer, Jenner & Block LLP, Los Angeles, CA, Charles B. Sklarsky, Nicole A. Allen, Chris C. Gair, Jenner & Block LLP, Daniel E. Reidy, Erin L. Shencopp, Jones Day, Mark L. Rotert, William P. Ziegelmueller, Stetler & Duffy, Ltd., Chicago, IL, Thomas Patrick McNulty, Sevan Ogulluk, Jones Day, Alexandra A. E. Shapiro, Macht, Shapiro & Isserles LLP, Caroline Rule, Kostelanetz & Fink, LLP, Christopher Michael Egleson, Douglass Bayley Maynard, Akin Gump Strauss Hauer & Feld LLP, Scott Andrew Resnik, Katten Muchin Rosenman, LLP, Barry H. BERKE, Dani R. James, Erin Anne Walter, Paul Henry Schoeman, Kramer Levin Naftalis & Frankel, LLP, Susan E. Brune, Theresa Marie Trzaskoma, Brune & Richard LLP, New York, NY, Laura Joy Edelstein, Brune & Richard LLP, San Francisco, CA, for Defendants.

## MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge:

Defendant Denis Field ("Field") moves to preclude the Government from relying on communications between BDO Seidman LLP ("BDO") and its outside attorneys, Morgan Lewis & Bockius LLP ("Morgan Lewis") and Hogan & Hartson LLP ("Hogan & Hartson"). Specifically, Field contends that BDO improperly waived attorney-client privilege as to those communications by failing to obtain his consent. For the following reasons, Field's motion is granted in part and denied in part.

## BACKGROUND

### I. The Investigation & Indictment

The Third Superseding Indictment (the "Indictment") charges Field and his co-

Defendants with, *inter alia*, conspiracy to commit tax fraud in connection with the design and implementation of various complex tax shelters. Field is the former Chairman and Chief Executive Partner of BDO, an accounting firm at the center of the alleged conspiracy. Field and two other BDO partners, Adrian Dicker ("Dicker") and Charles Bee ("Bee", and, collectively, the "Partners"), managed the firm's Solutions Services Group, which operated BDO's tax shelter business.[1]

During the Department of Justice's ("DOJ") criminal investigation into BDO's tax shelter business, BDO waived its attorney-client privilege and provided the Government with communications from 1999 to 2002 between its employees and outside counsel, Morgan Lewis and Hogan & Hartson. Without reference to any particular document, Field asks this Court to preclude the Government from relying on any communications between BDO and outside counsel.

## II. *Morgan Lewis's Representation of BDO*

In the fall of 1999, BDO retained Morgan Lewis as outside general counsel to provide legal services related to various ongoing BDO matters. In early 2000, Morgan Lewis began to evaluate BDO's exposure to criminal liability in connection with the Solutions Services Group's tax shelter activities (the "Evaluation"). Miriam Fisher ("Fisher"), a Morgan Lewis partner, was primarily responsible for the Evaluation, with assistance from Melvin Leftkowitz ("Leftkowitz"), another partner. In a letter to BDO's in-house general counsel, Fisher described the scope of the Evaluation:

[Morgan Lewis] is very pleased to have the opportunity to provide additional legal services to [BDO] .... We have been asked to provide BDO with a strictly privileged and confidential opinion letter concerning the operations generally known as Solutions Services. We intend to address the inapplicability of all federal criminal penalties to BDO, its wholly owned subsidiary BDO Solutions LLC, and its executives and other employees in connection with the core business activities of Solutions Services.

(Declaration of Stephanie Atkinson ("Atkinson Decl.") Ex. K: Letter from Fisher to Scott Univer ("Univer") dated June 28, 2000.)

During the grand jury investigation, Fisher testified that her "client was the accounting firm of BDO, that's who Morgan Lewis's client was, and that's who we had been retained by" for the purpose of "evaluat[ing] the potential criminal liability of what was then called the BDO Solutions [Services] Group, and its managers[,] who were Bee and Dicker." (Declaration of Nanette Davis ("Davis Decl.") Ex. D: Tr. of Grand Jury Testimony of Fisher dated July 8, 2008 ("Fisher Testimony") at 22–23.) Field concedes he had no contact with Fisher and offers no evidence of communications with Leftkowitz. Field maintains, however, that he communicated regularly with Charles Engros ("Engros"), then-managing partner of Morgan Lewis's New York office. While Fisher testified that she was aware Engros had at least one discussion with Field regarding the Evaluation, Field submits no evidence that Engros performed any work on the project.

In August 2000, while the Evaluation was ongoing, Fisher and Leftkowitz left

---

1. Dicker and Bee were indicted and pled guilty in separate proceedings and are now cooperating with the Government.

Morgan Lewis and joined Hogan & Hartson. On October 17, 2000, Fisher sent BDO's in-house general counsel a letter confirming she would continue to represent BDO in connection with the Evaluation:

> When I recently left Morgan Lewis to join this firm, Charles Bee confirmed that BDO ... wishes to continue to engage me and my colleague Melvin E. Leftkowitz in connection with an ongoing representation of the company. Therefore, we are pleased that BDO has engaged Hogan & Hartson ... to provide advice and consultation concerning the operations generally known as Solutions Services. This letter is intended to formalize our retention, as required by applicable Rules of Professional Conduct.
>
> . . . .
>
> This will confirm our understanding that BDO is our client for specific matters on which it engages us, and we shall not be deemed to represent its affiliates unless BDO advises us that such entities are directly involved in or affected by our representation of BDO.

(Davis Decl. Ex. F: Letter from Fisher to Univer dated Oct. 17, 2000 ("Hogan Letter") at 1–3.)

In January 2002, Hogan & Hartson completed the Evaluation and sent BDO a memorandum summarizing its conclusions. In a cover letter forwarding that memorandum to Morgan Lewis, Fisher recapped the assignment as follows:

> You have asked Hogan & Hartson to comment on the potential exposure of our mutual client BDO Seidman, LLP ... to criminal penalty in connection with one of its National Tax Consulting products . . . .
>
> . . . .
>
> You have asked for our views to ensure that BDO is correct in its own assessment that it has not engaged in any

misconduct that would implicate it in a criminal violation of any U.S. tax law.

(Davis Decl. Ex. H: Letter from Fisher to Engros dated Jan. 31, 2002.)

### III. *Morgan Lewis's Representation of the Partners*

In the fall of 1999—around the time Morgan Lewis assumed its role as BDO's outside general counsel—the Partners formally retained the firm to negotiate their personal compensation agreements with BDO. Under those agreements, the Partners received a percentage of BDO's profits from its tax shelter business. By letter dated October 29, 1999, Morgan Lewis informed BDO of its representation of the Partners and requested that BDO waive any conflict of interest:

> We have now been asked to act as independent counsel to Messrs. Field and Dicker, ... [and] Bee and one or more entities that the aforesaid individuals may establish, in connection with the negotiation of certain contractual arrangements between such parties and BDO. Through this letter, we are asking that BDO consent to such representation and waive any potential or actual conflict of interest arising from such representation.

(Davis Decl. Ex. C: Letter from Engros to Univer dated Oct. 29, 1999.) On November 2, 1999, BDO countersigned the letter, thereby waiving any conflict of interest. In June 2000, the compensation agreements were executed. While it is unclear from the parties' submissions which Morgan Lewis attorneys negotiated the Partners' compensation agreements, Field offers no evidence that Fisher or Leftkowitz had any involvement.

### IV. *Documents Pertaining to the Scope of Morgan Lewis's Representation of the Partners*

Notwithstanding Morgan Lewis's separate engagement letters for the Evaluation

and the negotiation of the Partners' compensation agreements, Field contends that the Evaluation covered both BDO and the Partners in their individual capacities. Specifically, Field points to handwritten notes believed to have been taken by Fisher in early to mid–2000 which contain the following phrases:

- "BDO Seidman, acting firm, Tax Solutions, corp + high net worth tax planning, profitable, risks individually...." (Atkinson Decl. Ex. G: Handwritten notes dated Feb. 28, 2000 at Bates No. BDO K 000001.)
- "[P]aid by firm, rep co., but rep. these guys in deal and risk analysis." (Atkinson Decl. Ex. H: Handwritten notes dated Mar. 1, 2000 at Bates No. BDO K 000065.)
- "Dicker, Bee, Field as individual [word unintelligible]. [W]hat is potential personal liability." (Atkinson Decl. Ex. I: Handwritten notes dated Mar. 2, 2000 ("March 2 Notes") at Bates No. BDO K 000067.)
- "[A]ny vulnerability personally, civilly indemnified." (March 2 Notes at Bates No. BDO K 000068.)
- "If indemnity is no good, could they be sued individually? Yes." (March 2 Notes at Bates No. BDO K 000069.)
- "Adrian + Charlie + _____, individually, all have invested $5 m./pc. in transactions, their own returns, personal criminal activity—very sophisticated, could it be held against." (Atkinson Decl. Ex. N: Handwritten notes dated Aug. 25, 2000 at Bates No. BDO K 000273.)

Field also points to a March 1, 2000 email memorandum from Paul Vogt ("Vogt"), another Morgan Lewis attorney, to Fisher and Leftkowitz, which forwarded drafts of the Partners' compensation and indemnification agreements. That email contained the following language:

> I understand you will be reviewing the [Partners' compensation and indemnification] documents and having discussions with Charlie, Denis and Adrian tomorrow. I understand that [Field] and [Dicker] are concerned about possible arguments that while they do not own any equity interests in the LLC, they do control the business and run the business and may in fact be interpreted to be "controlling persons" or they may be deemed to have a de facto equity ownership interest in the LLC. Also, on a related matter, I understand that they will be looking to the question of whether if there are any civil or criminal tax penalties asserted against the individuals, will the indemnification provisions of the agreement be enforceable?

(Letter from Caroline Rule to the Court dated Sept. 30, 2010 Ex. 2: Email from Vogt to Fisher, Gardner and Leftkowitz dated Mar. 1, 2000 at 2.)[2]

Field further contends that positions taken by BDO in an arbitration against Dicker and Bee demonstrate that Morgan Lewis represented the Partners for the purpose of evaluating their personal criminal liability. In a post-hearing brief from that arbitration, BDO argued:

> Messrs. Bee and Dicker specifically told the Morgan [Lewis] lawyers that they wanted personal representation and advice about their personal exposure to civil and criminal liability.... In fact, as reflected by the notes of Morgan [Lewis] lawyers, it is apparent that, while Claimants would cause BDO to pay their

---

2. In addition, Field identifies an undated email stating that Morgan Lewis's "individual clients at BDO were also investors" in a certain tax shelter transaction. That email is opaque and of minimal import.

fees, Morgan [Lewis] was providing feedback relating to Claimants' personal exposure, and was, in fact, treating Claimants as their clients.

(Atkinson Decl. Ex. B: Post–Hearing Brief dated Sept. 9, 2008 at 14–15.) In support of this argument, BDO relied on Fisher's handwritten notes from early 2000. For their part, Bee and Dicker argued during the arbitration that Morgan Lewis provided a "consensual joint representation of both them and [BDO]." (Atkinson Decl. Ex. C: Claimant's Final Hearing Memorandum undated at 10.) In a subsequent lawsuit against Morgan Lewis, however, BDO maintained that "[it was] the client for whom the review of the activities of the Tax Solutions Group was undertaken...." (Atkinson Decl. Ex. A: Compl. ¶ 42, *BDO Seidman, LLP v. Morgan, Lewis & Bockius LLP,* No.2009–CA–009640.)

Based on the forgoing documents, Field contends that Morgan Lewis and Hogan & Hartson advised him in a personal capacity on his potential criminal liability, and claims a personal attorney-client privilege over any communications with Morgan Lewis and Hogan & Hartson.

## DISCUSSION

### I. Legal Standard

■ The attorney-client privilege exists to promote "full and frank communications between attorneys and their clients" and to "encourage[ ] observance of the law and aid[ ] in the administration of justice." *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL–CIO,* 119 F.3d 210, 214 (2d Cir.1997) (quotations omitted). "The broad outlines of the attorney-client privi-

lege are clear: '[ ] where legal advice of any kind is sought [ ] from a professional legal advisor,' " a client's confidential " 'communications relating to that purpose ... [are] permanently protected [ ] from disclosure ...,[ ] except the protection [may] be waived.' " *Teamsters,* 119 F.3d at 214 (quoting *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983,* 731 F.2d 1032, 1036 (2d Cir.1984)). "[S]ince the attorney-client privilege stands in derogation of the public's right to every man's evidence, it [should] be strictly confined within the narrowest possible limits consistent with the logic of its principle." *Teamsters,* 119 F.3d at 214 (quotations omitted). "The burden of establishing the existence of an attorney-client privilege, in all of its elements, rests with the party asserting it." *Teamsters,* 119 F.3d at 214.

■ In the case of corporations and other entities,[3] "[t]he administration of the attorney-client privilege ... presents special problems." *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 348, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985). As the Supreme Court has observed, "[a] corporation cannot speak directly to its lawyers" but rather "must act through agents." *Weintraub,* 471 U.S. at 348, 105 S.Ct. 1986. Accordingly, there is generally little distinction between the employee and the corporation in the context of communications with corporate counsel. Indeed, "any privilege that attaches to communications on corporate matters between corporate employees and corporate counsel belongs to the corporation, not to the individual employee, and ... employees generally may not prevent a corporation from waiving the attorney-client privilege arising from such communications." *Teamsters,* 119 F.3d at 215.

---

**3.** The application of *Teamsters* to a large partnership such as BDO is addressed in Part II

*infra.*

The Court of Appeals recognizes a personal claim of privilege over conversations between a corporate employee and corporate counsel only where the employee demonstrates that he "sought [ ]or received legal advice from [counsel] on personal matters." *Teamsters*, 119 F.3d at 216. While the Second Circuit did not explicate this standard, it can be distilled into two components: (1) the employee must seek or receive legal advice, and (2) that advice must relate to the individual's interests, as opposed to the corporation's. Focusing on the first component, the Court of Appeals drew on other circuits' decisions that require the employee asserting privilege to make clear to corporate counsel that he seeks advice in his individual capacity.[4] *Teamsters*, 119 F.3d at 215 (citing decisions from the First, Third, and Sixth Circuits reflecting this concern).

As Judge Kaplan noted in *United States v. Stein*, however, the second "personal matters" component of the *Teamsters* standard is unrefined:

> *Teamsters'* holding ... rests on the scope of "personal matters." But the meaning of that phrase has not been developed. Do "personal matters" involve solely the individual, with no impact on the entity's interests whatsoever? Or may they encompass matters that implicate both the individual and the entity? Although the facts of *Teamsters* suggest that the Circuit might have contemplated the former view, it did not expressly address the question.

463 F.Supp.2d 459, 464 (S.D.N.Y.2006). Judge Kaplan ultimately found that he "need not determine the parameters of 'personal matters'" because the communications in *Stein* related solely to the defendant's conduct in her professional capacity

as an accounting partner, and did not implicate her personal interests and liabilities. 463 F.Supp.2d at 465–66.

Similarly, this Court need not explore the precise contours of the "personal matters" component to resolve this motion. On the record before this Court, Field's privilege claim plausibly extends to two categories of communications with Morgan Lewis and Hogan & Hartson: (1) those relating to the negotiation of his compensation agreement and (2) those relating to the Evaluation. As to the first category, Field satisfies even the narrow interpretation of the personal matters component. However, as to communications relating to the Evaluation, he fails to establish the separate, threshold requirement that he sought or received legal advice.

## II. *Application of Teamsters to BDO*

■ As an initial matter, this Court finds that Field's privilege claim is properly evaluated under the *Teamsters* standard, notwithstanding that BDO is a partnership rather than a corporation. While "[t]he question whether *Teamsters* applies in a partnership case is not entirely clear," *Stein*, 463 F.Supp.2d at 464, the Court of Appeals did not limit its holding to corporations, but rather contemplated "any entity that employs its own counsel to represent its interests, even though not all such entities are in fact corporations." *Teamsters*, 119 F.3d at 214 n. 1; *see also United States v. Campbell*, 73 F.3d 44, 47 (5th Cir.1996) ("A limited partnership, like a corporation, is an inanimate entity that can act only through its agents. Accordingly, the same [privilege] rule[s] [applies to both.]"). BDO falls squarely within that class of entities.

---

**4.** While Field asks this Court to apply the Third Circuit's five-factor test as set forth in *In re Bevill, Bresler & Schulman Asset Man-* *agement Corporation*, 805 F.2d 120, 123 (3d Cir.1986), the Court of Appeals did not explicitly adopt that standard in *Teamsters*.

BDO is a sophisticated limited liability partnership with over two hundred partners which routinely retains outside counsel to represent its interests as opposed to the interests of any individual partner. When BDO's outside counsel represents an individual partner—as Morgan Lewis did in negotiating Field's compensation agreement—it obtains a waiver of any conflict of interest between the partnership and that partner. Thus, BDO itself distinguishes its interests from those of its partner members. *Cf. Stein*, 463 F.Supp.2d at 464 ("[Defendant] has not sustained her burden of demonstrating that the circumstances of her partnership support treating her as anything other than an employee for purposes of the privilege. KPMG is a limited liability partnership with over one thousand partners who probably are not exposed to unlimited liability for partnership obligations.").

This Court rejects Field's contention that BDO holds no independent claim of privilege. He argues that a partnership is generally not treated as legally separate from its partners under New York law. However, the federal common law of privilege applies in a prosecution under federal law. Fed.R.Evid. 501; *see In re Katz*, 623 F.2d 122, 124 n. 1 (2d Cir.1980). Moreover, the rule under New York law treating a partnership as legally indistinguishable from its members has been relaxed in analogous contexts. *See In re Nassau Cnty. Grand Jury Subpoena Duces Tecum Dated June 24, 2003*, 4 N.Y.3d 665, 797 N.Y.S.2d 790, 830 N.E.2d 1118, 1125 (2005) (rejecting a law firm partner's attempt to impede production of the firm's documents based on a Fifth Amendment privilege claim because, *inter alia*, the firm was "not a family partnership or association," but rather "a well structured, not informal, organization" that "maintain[ed] a distinct set of organizational records"). Accordingly, Field's assertion of attorney-client

privilege is properly evaluated under *Teamsters*.

### III. Scope of Morgan Lewis's Representation

■ Turning to the substance of Field's privilege claim, the record demonstrates that Field "sought [and] received legal advice from [Morgan Lewis] on personal matters" relating to the negotiation of his compensation agreement. *Teamsters*, 119 F.3d at 216. A partner's individual compensation is unquestionably personal in nature. Further, Field formally and individually retained Morgan Lewis to negotiate his compensation package and received legal services culminating with an executed compensation agreement. *See Teamsters*, 119 F.3d at 216. In negotiating Field's compensation package, Morgan Lewis represented only his personal interests, not BDO's. Indeed, BDO was represented by another law firm during those negotiations. Thus, BDO's and Field's interests were fully segregable as to that transaction. *See Stein*, 463 F.Supp.2d at 465 ("[Defendant] could not prevail on a privilege claim absent a showing that communications implicated her interests alone and were segregable from those involving KPMG's interests."). Accordingly, any communications pertaining solely to the negotiation of Field's compensation agreement are subject to an attorney-client privilege that may be waived only by Field.

■ In contrast, Field has not met his burden of establishing an attorney-client privilege over communications with Morgan Lewis and Hogan & Hartson relating to the Evaluation. *See Teamsters*, 119 F.3d at 214 ("The burden of establishing the existence of an attorney-client privilege ... rests with the party asserting it."). First, Field conflates Morgan Lewis's negotiation of his compensation agree-

ment with the Evaluation.[5] Fisher testified that during the Evaluation she viewed BDO, not the Partners, as her client. Her testimony is corroborated by the various representation letters from Morgan Lewis and Hogan & Hartson. In its letter seeking a waiver from BDO, Morgan Lewis expressly limited its representation of the Partners to the negotiation of their compensation packages. The Evaluation began four months later. And in its letter memorializing that engagement, Morgan Lewis stated that BDO was its client. If Morgan Lewis had intended to represent Field in his personal capacity as well, it would have sought a conflict waiver just as it did when it negotiated his compensation agreement.

Similarly, Fisher's letter restating the scope of the Evaluation following her migration to Hogan & Hartson makes no reference to the Partners' involvement and did not seek a conflict of interest waiver for them. Rather, the letter "confirm[ed Hogan & Hartson's] understanding that BDO [was the] client." (Hogan Letter at 1–3.) Hogan & Hartson reiterated that understanding when it completed the Evaluation. (*See* Fisher Letter at 1–2 (stating that Hogan & Hartson was asked to comment on "the potential exposure of our *mutual client BDO Seidman, LLP* " and whether "*BDO* is correct in its *own* assessment that it has not engaged in any [criminal] misconduct") (emphasis added).)

As these letters demonstrate, there is no indication that Field "sought or received" any legal advice from either law firm related to the Evaluation. *Teamsters*, 119 F.3d at 216. Notably, Field does not identify a single communication indicating that Morgan Lewis or Hogan & Hartson provided him with advice regarding his personal

criminal liability. Similarly, Field admits that he never communicated directly with Fisher and makes no claim that he discussed the Evaluation with any other individual. *See MacKenzie–Childs LLC v. MacKenzie–Childs*, 262 F.R.D. 241, 254 (W.D.N.Y.2009) (defendants failed to allege that they "actually communicated directly" with corporate counsel). While Field argues that he communicated regularly with Engros, he does not assert that those communications related to the Evaluation or that he made clear to Engros he was seeking advice in his personal capacity. *See Teamsters*, 119 F.3d at 215–16.

To the extent Fisher's notes discuss the Partners' potential personal liability, they are ambiguous. Phrases such as "risks individually" or "what is potential personal liability" may simply reflect counsel's concern for BDO's potential exposure to secondary liability. Moreover, they reflect Fisher's mental impressions, and do not establish that she advised Field on these matters. Vogt's March 1, 2000 email to Fisher is also vague as it establishes only that Fisher was aware of Field's and Dicker's concerns about the interplay between indemnification provisions and civil or criminal tax penalties and about their roles as potential "controlling persons." It does not show that Fisher provided them with any specific advice on these issues.

Finally, positions taken by BDO in a later arbitration fail to demonstrate that Field sought or received legal advice on his personal criminal liability. The probative value of those statements is dubious, as they were made years after the Evaluation in an adversarial proceeding. *See Stein*, 463 F.Supp.2d at 461 (finding "statements made by counsel for [the defendant] and KPMG well after the fact" to be irrele-

---

**5.** While Vogt's March 1, 2000 email indicates that Fisher received compensation-related documents before interviewing the Individual Partners in connection with the Evaluation, it does not establish Fisher's involvement in the negotiation of the compensation agreements.

vant). Moreover, BDO's argument during the arbitration that Morgan Lewis advised the Partners on their personal liability rested on the same unstable foundation that Field attempts to build on here—Fisher's ambiguous handwritten notes. And in a later litigation, BDO undermined its position by maintaining that the partnership was "the client for whom the review of the activities of the Tax Solutions Group was undertaken." (Atkinson Decl. Ex. A: Compl. ¶ 42, *BDO Seidman, LLP v. Morgan, Lewis & Bockius LLP*, No.2009–CA–009640.)

 Because Field has failed to establish that he sought advice concerning his potential criminal liability in a personal capacity, he may not assert an attorney-client privilege over communications with Morgan Lewis and Hogan & Hartson pertaining to the Evaluation. *Teamsters*, 119 F.3d at 216. Accordingly, this Court need not address the parties' arguments concerning the applicability of the crime-fraud exception. If the Government seeks to invoke the exception as to communications concerning the negotiation of Field's compensation agreement (an issue which the parties did not raise), it must do so with respect to a specific communication. "[T]he crime-fraud exception applies only where there is probable cause to believe that the *particular communication* with counsel or attorney work product was intended in some way to facilitate or to conceal the criminal activity." *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir.1995) (emphasis added).

### CONCLUSION

For the foregoing reasons, Defendant Denis Field's motion to preclude the Government from relying on communications with Morgan Lewis and Hogan & Hartson is granted in part and denied in part. Field may assert an attorney-client privilege over any communication pertaining solely to Morgan Lewis's negotiation of his compensation agreement. Field may not assert the privilege over any communication pertaining to Morgan Lewis's or Hogan & Hartson's representation of BDO Seidman LLP. The Clerk of the Court is directed to terminate the motion pending at Docket No. 107.

SO ORDERED.